RUDIGER et al. v. COLEMAN et al.

(Supreme Court, Appellate Division, Second Department. December 30, 1908.)

1. CONTRACTS (§ 322*)—RESCISSION—EVIDENCE—BREACH BY DEFENDANT.

Evidence *held* not to show that defendant refused to form a corporation, thereby violating an agreement providing that a corporation should be formed.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 322.*]

2. MINES AND MINERALS (§ 83*)—CONTRACTS—CONSTRUCTION.

Plaintiffs, who owned a farm containing a granite quarry, and who held a contract for the purchase of another farm also containing ·a granite quarry, agreed to convey the farm and assign the contract to defendants, who had a contract for the construction of a dam. Defendants were to pay a cash consideration and form a corporation to which the land was to be reconveyed, plaintiffs to have 40 per cent. of the stock therein and defendants 60 per cent., and defendants were to take stone from the quarries only for the purpose of "completing the present contract for the completion of the new Croton dam." *Held* that, under the contract, plaintiffs were to give defendants the granite needed for the completion of the contract in consideration for their forming the corporation and giving plaintiffs 40 per cent. of the stock; and the amount of granite to complete the dam being in excess of the approximated amounts in the contracts, and alterations of plan necessitating an additional amount, defendants were entitled under their contract with plaintiffs to take the additional amounts from the quarries.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 214; Dec. Dig. § 83.*]

3. EQUITY (§ 43*)—JURISDICTION—REMEDY AT LAW.

Resort to equity cannot be had to recover a share of rents received by defendants under a contract between plaintiffs and defendants, and amounts collected by defendants for plaintiffs, where the amounts can be readily ascertained and recovered at law.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 121; Dec. Dig. § 43.*]

4. MINES AND MINERALS (§ 83*)—CONTRACTS—EVIDENCE.

Evidence *held* not to show that defendants, who had a contract with plaintiffs to take what granite they needed to build a dam from plaintiffs' quarry, operated the quarry improperly and took out the rock in such a way as to violate their agreement to develop the quarry for commercial uses to which it was to be put after the completion of the dam.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 214; Dec. Dig. § 83.*] . ·

5. EQUITY (§ 39*)—JURISDICTION—RETENTION OF JURISDICTION—COMPLETE RELIEF.

Where a court of equity obtains jurisdiction of a case for any purpose, it will decide the whole controversy, even though it involves issues legal in their nature; but, when the demand upon which the suit is based is detemined adversely to plaintiffs, the whole theory of their resort to equity being unfounded, the court does not obtain jurisdiction for any purpose, and should not retain the suit to decide minor collateral matters about which there is substantially no dispute, and hence where plaintiffs contended that defendants had disregarded their agreement involving the use of quarries conveyed to them by plaintiffs, and asked a rescission of the agreement and a reconveyance of the quarries, and the contention was unfounded, the court should not retain the suit to settle

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

114 N.Y.S.—44

demands of the parties for rents of buildings and wages of laborers involving comparatively trivial amounts.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 104; Dec. Dig. § 39.*]

Appeal from Special Term, Kings County.

Action by Eugene A. Rudiger and another against James S. Coleman and others. Judgment for defendants, and plaintiffs appeal. Affirmed on the opinion of the court below.

The opinion of the lower court was as follows:

The object of this litigation is best described in the language of the learned presiding justice of the Appellate Division of this court, in the opinion on which the judgment rendered on the former trial was reversed (Rudiger v. Coleman, 112 App. Div. 279, 98 N. Y. Supp. 461): "The primary object of this action is to procure the rescission of an agreement made between the parties on June 16, 1899. Incidental to such purpose equitable relief is asked for an accounting by the defendants, for a reconveyance by them to the plaintiffs of certain real estate which had been deeded by the plaintiffs to the defendants pursuant to the terms of the agreement, and further for a decree impressing said property with a trust. At the time of the execution of the agreement, the defendants were under contract with the city of New York for the construction of the new Croton dam in Westchester county. That work involved the use of large quantities of granite covering many square miles of land in the neighborhood of the construction and necessitated the building of bridges, abutments, and appurtenances, and the laying of many miles of roadway. The plaintiffs at that time were the owners of a certain farm near the site of the dam, and had also contracted for the purchase of another farm, on which farms were undeveloped granite quarries. The agreement provided for the deeding by the plaintiffs to the defendants of the one farm and the assigning of the contract for the other, and that these farms should, in turn, be conveyed by the defendants to a quarrying company immediately upon its formation, for which full-paid stock of the company should be issued, 40 per cent. to be delivered to the plaintiffs and 60 per cent. to the defendants. It was further provided in the agreement that the expense of developing the quarries should be borne by the defendants and that the latter would use the stone obtained from the quarries for the purpose of completing their contract with the city. The provision for the formation of the company as contained in the agreement is as follows: 'Within six months after the delivery of the deed and assignment of the contract as herein provided, a corporation shall be formed for the purpose of quarrying and selling granite, and the execution of contracts in which granite is used, consisting of all the parties hereto, in accordance with a certificate and by-laws, a copy of which by-laws is hereto annexed.' The corporation was never formed, but the work of completing the dam and the other work alluded to in the agreement have been done by the defendants with the use of stone from the quarries on the farms. The complaint sets forth various alleged breaches of the conditions of the agreement on the part of the defendants, full performance on the part of the plaintiffs, and various specific charges of wrongdoing and waste which it is unnecessary to detail."

Upon the former trial the court found that the plaintiffs had not made out a case for granting the main relief sought. It was found that plaintiffs' claim, that the defendants had failed to carry out their part of the agreement of June 16, 1899, was not supported by the evidence. The two fundamental propositions which plaintiffs allege and must prove to sustain this action are, first, that defendants failed and refused to incorporate the company mentioned in the agreement of June 16, 1899; secondly, the defendants have violated the agreement by taking granite from the quarry which they were not authorized to take. The plaintiffs' right to the relief demanded in this action, viz., that the contract be declared rescinded, that defend-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ants be declared to hold the real property conveyed to them as trustees for plaintiffs, and that they be required to reconvey, and plaintiffs' demands for an accounting and damages—all this is based on the theory that the contract has been rescinded and annulled by defendants, that they are wrong-doers and trespassers on land which belongs to plaintiffs, and that they have wrongfully removed from plaintiffs' land vast quantities of granite.

Those two fundamental propositions were not proven to the satisfaction of the justice who presided on the last trial, and, after a careful hearing of the evidence on the second trial, I reach the same conclusion. Were it not for the vigor with which the learned counsel for plaintiffs maintains his view of the facts and the avalanche of figures and engineering data with which the record is filled, I would say that the issue is a simple one. The ordinary methods of common-sense men, the obvious understanding of the parties, the elementary principles for determining what the facts are in a given transaction should not be lost sight of, because the case is filled with claims for hundreds of thousands—indeed millions of dollars in damages—involved with complicated scientific data, geological questions and connected with, what is described as, one of the greatest engineering works in the world. If we can rid ourselves of the spectacular features of the litigation and get down to the important questions of fact, the decision of the issues will be much simplified.

I refer in the first place to the claim that defendants have violated the agreement with plaintiffs by refusing to form a corporation as they agreed in the contract of June 16, 1899. The plaintiffs have absolutely failed to prove any default or refusal on defendants' part in that regard. It is true that no corporation has been formed, but on the proof here it would be absurd to condemn the defendants for the failure. They were under no more obligation to take the initative in forming the corporation than were the plaintiffs. The plaintiffs concededly did nothing; on the contrary, the defendants retained counsel to prepare the incorporation papers in due season. They were prepared. The plaintiffs' counsel, at that time Mr. Edward L. Frost, expressed himself as fully satisfied with them. The defendants executed the certificate of incorporation, and by-laws were prepared. Defendants had prepared and executed a deed conveying the land to the corporation, all in accordance with the agreement of June, 1899, when, at the eleventh hour, the defendants' proceedings to incorporate were halted by a demand that the certificate of incorporation provide for "cumulative voting." Who first suggested cumulative voting in the new corporation does not appear. Nothing is said about cumulative voting in the agreement of June, 1899. It was not mentioned or referred to at the outset of the negotiations between the lawyers. On the present trial, over the exception of defendants, I admitted evidence of the dealings of the parties leading up to the agreement of June 16, 1899, because the Appellate Division referred to the inability of the parties to agree on the terms for the formation of the corporation and to the indefiniteness of the agreement in some respects. And, after hearing this evidence, I agree with the learned justice who tried this case before that at tue time the agreement was signed the idea of cumulative voting never entered the mind of either party. I doubt if Mr. Rudiger had ever heard of or understood what it was. Despite the claim of the learned counsel for plaintiffs, I cannot agree that it is either a usual or ordinary method of electing directors. It is provided for in the general corporation law (section 20), but it is not the customary method. Mr. Frost, the counsel then representing the plaintiffs, said nothing about it when he approved the form of the incorporation papers prepared by defendants in January, 1900, writing to Mr. McClure on January 30th: "Your favor enclosing proposed certificate of incorporation duly received, I have talked with Mr Rudiger about it and there is no disposition to object in the slightest degree to any part of it." And again on June 8, 1900, Mr. Frost wrote to Mr. McClure: "My Dear Sir: Mr. Rudiger called a few days since and said that the Colemans and Mr. Breuchaud had signed the certificate of incorporation and forwarded it to you: also that you were to prepare the deed and agreements under our first agreement. There is absolutely nothing to be discussed in the matter further, I think, except such as you and I can

determine as to the form the agreements should take." The "agreements" referred to in the letter were entirely distinct from the certificate of incorporation. Under the ruling of the court on this trial, Mr. Rudiger was allowed to give his story of the transaction leading up to the agreement, and his efforts to show that he had some idea of cumulative voting or that the subject was ever referred to or thought of did not impress the court favorably. While cumulative voting might have enabled plaintiffs to elect one member of the board of directors despite their minority holding of the stock, I do not see that their rights would be any better protected by minority representation on the board of directors than by insistence in their rights as minority stockholders. In these days minority stockholders are protected from dishonesty or breach of trust on the part of the majority, even though they may be denied representation on the board of directors. I think the plaintiffs anticipated evil that might never come to pass, and, in any event, there was nothing in the agreement or in the facts leading up to the making of the agreement which justified them in refusing to form the corporation because of the absence of provisions for cumulative voting. I agree with the judge on the last trial that "it was an afterthought on the part of plaintiffs or their counsel" (opinion, Maddox, J. on last trial). To hold that the defendants refused to carry out the agreement to incorporate would be to disregard all the evidence in the case. On the contrary, they took the laboring oar. They prepared the papers, and it was the plaintiffs, not the defendants, who defaulted and refused to sign. The claim that defendants refused to do business at the quarry, to sell the stone to outsiders, and engage in the business for which the corporation was to be formed is disposed of by the express agreement of the parties that the quarrying company was not to engage in active business until the dam was built. It was not built until 1904 or 1905. Until it was completed, the defendants had the right to take stone for the purposes of their contract precedent to everything else. It is true that work was at one time temporarily suspended in the quarry, but defendants were under obligations to resume at any time, and it is evident that they could not begin any independent business in the quarry until the city contract was completed. But this has no bearing on plaintiffs' claim that there was a refusal to form the corporation. That claim is not supported by the testimony in any way. As I said at the outset, the disposition of this issue seems to me to be very simple. The claim that defendants are at fault in this matter is not established, but, on the contrary, is disproved.

The other proposition upon which plaintiffs' case depends is the claim that the defendants wrongfully took granite from the quarry upon the land transferred to them for purposes other than those mentioned in the agreement and within the contemplation of the parties. The plaintiffs have failed to prove this proposition by a fair preponderance of the testimony, and again the proofs negative the claim. The plaintiffs were men of mature years and civil engineers by profession. They were experienced in construction work and in construction contracts. They were familiar with the proposed engineering feat of building this immense dam, described on the trial as one of the largest, if not the largest, enterprise of the kind in the world. They owned a quarry in the vicinity. They were personally interested, because they desired to supply stone from their quarry for the work. For two or three years before the making of the agreement with defendants they had been figuring on supplying granite for the dam. They had in their possession the forms, or copies of the defendants' contract with the city. They examined them. They were familar with the terms of the city contract. They were familiar with the work, familiar with the locality of the dam, and knew what was going on there. One of them resided in Peekskill. It is inconceivable that a trained engineer could read the contract under which defendants were doing the work, without being impressed with the fact that the defendants' undertaking was complete. It was to do all the work necessary to turn over a completed structure with its appurtenances. It is true, as commented on by plaintiffs, that there was some work which defendants did not perform. They did not supply the steel superstructure and possibly other details, but their contract with the

city was to supply all the stone necessary for this stupendous work and to complete the dam with all its surroundings, roads, bridges, gate houses, and attachments. And a layman, let alone an experienced engineer, could not fail to be impressed with the fact that no attempt was made to state with exactness the quantity of granite to be used. The quantities given in the contract were mere approximations, and the contractors were warned that they were only approximations and cautioned to examine the work and satisfy themselves as to quantities so as to avoid any claims that they were misled. The authority to the city's engineers to change the plans was absolutely unlimited, and the price paid for the work was computed by the quantity of stone, excavation, etc., going into the work, and was not a lump sum. These general provisions, approximations of the amount of material and labor required, are not unusual in undertakings of this nature. Whether they are productive of good results in all cases is not for the court to say. It might be claimed that in a work of this description they were unavoidable. Be that as it may, these provisions are found in the defendants' contract with the city. Plaintiffs were familiar with them. Before the agreement of June, 1899, was made, radical changes had been directed under these identical provisions, and the plaintiffs knew of them, or to say the least, they should have known of them. One change, the Fteley extension, had been ordered. The change had been commented upon in engineering journals. The plaintiffs had seen the change referred to. It was visible in the ground. It directly affected the quanity of granite needed, and, unless the plaintiffs are allowed to stultify themselves, they cannot plead ignorance of the fact. They were not merely casual onlookers. They were civil engineers interested in supplying granite to the work, with copies of the plans and contracts in their possession and familiar with the ground.

The plaintiffs' quarry contained, and still contains, a supply of granite far in excess of quantities with which ordinary men are accustomed to deal. Mr. Rudiger estimates that in June, 1899, the quarry on the Field farm contained between 6,000,000 and 7,000,000 cubic yards of granite. This is an almost inconceivable quantity. It is plaintiffs' own estimate. If we take plaintiffs' figures as stated in the complaint (paragraph 18) and assume that defendants took out of the quarry 350,000 cubic yards of granite, the amount of stone still remaining in the quarry on the Field farm alone, according to plaintiffs' estimate, would be over 5,500,000 cubic yards. A consideration of these enormous masses of material throws some light on the agreement between the parties. Plaintiffs owned this vast deposit of granite conceded to be of excellent quality. It was situated inland, removed from tidewater. It was unavailable to plaintiffs in anything approaching its value. It required large expenditure of money for the development, opening up of the quarry, and the marketing of the stone. To be profitable, contracts must be procured for large quantities of granite, justifying the necessary expenditure and the cost of transportation. Mr. Eugene Rudiger, one of the plaintiffs, had been interested with other parties in quarrying operations at the Mohegan quarry in the neighborhood of the quarries in suit, supplying stone to the new cathedral of St. John the Divine in Manhattan borough. In the settlement of the business arrangements connected with the Mohegan quarry, the plaintiffs became the owners of the Field farm, and they subsequently became owners of a contract for what is described as the Horton tract. Plaintiffs had endeavored to sell their stone to one Onderdonk for use in the dam without success. They tried to sell the stone to defendants. Defendants would not buy. Defendants asked plaintiffs to name a price for their property. Plaintiffs would not sell. They wanted to retain an interest in this vast supply of granite, and finally the agreement of June 16, 1899, was entered into. By this agreement (Exhibit 10) the plaintiffs, in consideration of $6,000 and the promises of the defendants in the agreement contained, agreed to convey to defendants the Field farm and to assign to them the contract for the Horton farm. Defendants agreed to "purchase" the property for $6,000—paying $3,000 cash and assuming payment of a $3,000 mortgage on the Field farm. The premises were conveyed to defendants in fee simple. The Horton contract was to be assigned by a proper instrument. De-

fendants were to pay the money due on the Horton contract, $4,675, returning to plaintiff $250, which they had paid. The further consideration to be given for the conveyance and assignment was set forth in the agreement: "First. The parties of the second part [defendants] shall agree to take stone from the premises herein referred to, only for the purpose of completing the present contract for the completion of the new Croton dam now being constructed by the parties of the second part." It is to be noted that the stone was to be taken, not for the purpose of completing the dam, but for "completing the present contract for the completion of the new Croton dam."

But plaintiffs desired to retain an interest in the property, and, while defendants had the right to take the granite necessary to complete their contract without charge, it was agreed that a corporation should be formed for the purpose of quarrying and selling granite. The Field farm was to be immediately deeded back to the corporation, reserving defendants' right to take the granite as described, and the stock in the corporation was to be divided, 40 per cent. to plaintiffs and 60 per cent. to defendants. If within three years from the date of the agreement the Rudigers paid to defendants 40 per cent. of the cost of the Horton tract, that, too, was to be conveyed to the new company with a similar reservation to the defendants of the right to take the stone necessary to complete the contract. The three-year period was made of the essence of the agreement, and, if the plaintiffs failed to pay the 40 per cent., the Horton land was to be and remain the absolute property of defendants. The expense of developing the property was to be borne by defendants. The plant required to operate the quarry by the quarrying company was to be furnished by defendants in the first instance, and charged to the company at an agreed valuation. It was stipulated "that the requirements, for the dam contract take precedence to all other business until said dam is completed by the parties of the second part and the business of the company shall not interfere therewith."

I think the intention of the parties is clear. The plaintiffs were to give the defendants the granite needed for the completion of the contract free of charge, and when that contract was completed, with the use of what was comparatively a small fraction of the granite available, 350,000 cubic yards out of between 6,000,000 and 7,000,000 yards to use their own figures, plaintiffs were to own 40 per cent. of the capital of the company controlling the vast residue, with a plant for operation installed, and with the remaining 60 per cent. of the stock owned by defendants with their resources and business standing, and an agreement for the operation of the quarry and the disposal of the great mass of granite for their joint benefit. There was no question as to defendants' right to take the stone for all of the purposes of the contract with the city, with its elastic provisions regarding quantities, changes, and alterations. Great as the quantity of granite required to complete the contract was, it was insignificant compared with what was left to the company. There was never any question as to defendants' right to use the granite for the various purposes for which it was used. The plaintiffs knew of the uses to which it was put. The evidence conclusively shows their presence in and about the work. Certainly there was no concealment by defendants of their purpose. If plaintiffs had any idea of limiting the use of the granite, surely they would have been on the ground investigating the uses, and calling attention to improper use. They never objected. The attempt of the plaintiffs on this trial to deny a familiarity with existing conditions, which they admitted on the first trial and which was referred to in the opinion of the trial justice, justifies criticism on their entire bona fides on this hearing. I find it impossible to accept their statement that they were ignorant of the work which was progressing; that they did not know that the granite was going into bridges, culverts, roadways, the Hill extension, and many works, alterations, and additions that were made under the provisions of the contract. I think their own conduct furnishes the strongest kind of evidence that they construed their agreement with defendants to mean that the contractors had a right to use the granite for all these purposes. At page 16 of the transcript of Mr. Rudiger's testimony furnished me by plaintiffs, the plaintiff was ask-

ed on cross-examination whether he read the provisions of the city contract concerning rock excavations. He replied that he was not interested in rock excavation, and gave it no attention.

The following then appears: "Q. Did you read and understand it? A. Yes. Q. That it meant excavation of rock for foundations of the dam were to be extended as ordered by the engineer? (Objection, overruled, exception). A. I gave no attention to it if I read it. Q. You were figuring on the amount of masonry to be put in, in 1896, 1897, and 1899, were you not? A. Yes. The Court: Wouldn't the amount of excavation have a bearing on it? A. No. Q. Wouldn't it have a bearing on the masonry to go into the excavation? A. Yes. Q. Why were you not interested, if the stone was to go into the excavation? A. I did not care how deep they went. (Objection to court's questions, overruled, exception). Q. Is it a fact that you did not care how much or little they took? A. That is the idea. I wanted to furnish all that was needed."

This testimony from the plaintiff seems to me to throw considerable light on what was in the contemplation of the parties. When he was figuring out on the contract with the city, Mr. Rudiger did not care how much granite was taken for the work because the payments were for the quantity taken; the more taken the better. He cannot invoke a different interpretation to support his claim that the defendants wronged him and violated the agreement when they interpreted the contract with the city as he did.

Plaintiffs refer continually in their argument and brief submitted to the large amount received by defendants from the city. It is said that they were paid in all $8,000,000, and that on the original approximated quantities they would have received but $4,000,000. Defendants dispute the plaintiffs' computations. In fact, they claim, and the proof apparently shows, that they took a less quantity from the quarry than was called for in the approximate estimates. But, granting that they received $8,000,000, I fail to see what the plaintiffs have to do with that. Plaintiffs were not the contractors with the city. The large sum of money paid was presumably paid for work done and material furnished by defendants. Why should plaintiffs object? The plaintiffs' rights are to be determined by their agreement made with the defendants, not by the amount of money defendants were enabled to obtain by the use of the granite. Plaintiffs were in possession of between 6,000,000 and 7,000,000 cubic yards of granite before the making of the agreement of June, 1899, and yet it was not a source of profit to them. They lacked the capital and the ability and opportunity to find a market for it. And, when they finally succeeded in opening a way for the development of the property, they appear to have unreasonably and without necessity blocked their own way by refusing to carry out the agreement on suspicions that they were to be "frozen out," as their counsel expresses it. To my mind, it would have been better for them to have gone on with the agreement relying on the protection of their rights if they were interfered with than to seek to introduce provisions and limitations into the articles of incorporation, which were not provided for in the agreement or within the contemplation of the parties.

I have carefully examined the elaborate brief of the learned counsel for the plaintiffs, and the many arguments and claims advanced to support his contention that defendants have wronged his clients. Outside of certain money due as plaintiffs' share of rents received for buildings placed by defendants on the land, and certain money collected by defendants for plaintiffs' account from laborers in the quarry—deducted from the wages by defendants under arrangement with plaintiffs and to be paid over—I can see no grievance which plaintiffs have a right to assert. These two matters would never justify resort to equity. The amount can readily be ascertained and recovered at law. Plaintiffs owe defendants certain rent money, but it is apparent from the evidence on the trial that these matters are not the cause of this litigation. There is apparently no dispute between the parties and no disposition on either side to refuse payment. Neither is there necessity for resort to equity to ascertain and recover the amounts due. The plaintiffs have an adequate remedy at law.

The plaintiffs assert that the defendants did not operate the quarry prop-

erly, and that they took out the rock in such a way as to violate their agreement to develop the quarry for the commercial uses to which it was to be put after the completion of the dam. As to this claim, there was some question whether it was pleaded in the complaint. The plaintiffs moved to amend on this second trial by inserting a clause in the complaint specifically asserting this grievance. I doubted the power of the court at this stage of the litigation at the trial to allow such an amendment, and denied the motion. But the plaintiffs were allowed to introduce their evidence in support of the claim, and the defendants introduced evidence in opposition. If the quarrying company had been formed, this cause of action, as well as the claim that timber was improperly removed from the land, would belong to the quarrying company. But the evidence does not support either claim. Quarrying operations involving the removal of quantities of rock and the use of explosives cannot be conducted with the nicety of sculpturing. The appearance of this quarry as shown in the photograph appears typical of all quarries in operation. The defendants' witnesses say the work was properly done, and one of them, a geologist, describes the character of this particular rock and the presence of seams and disintegrated stone to an extent that would render it difficult, if not impossible, to leave the ledges or benches in uniform position. The evidence does not support the claim of waste in connection with the removal of trees. The claim that plaintiffs were interfered with in the maintenance of the supply store and boarding house is not substantiated. The plaintiffs voluntarily gave up the boarding house in 1901, and in their letter to defendants notifying them of the fact no suggestion is made that their rights were in any way interfered with. Indeed, throughout a period of between four and five years after the making of the agreement of 1899, while the work of completing the dam was in progress, the relations between the plaintiffs and the defendants appear to have been entirely friendly, with no indication that trouble or disputes existed. Even after the assertion of the claim in 1900 that the provision for cumulative voting should be inserted in the articles of incorporation of the quarrying company, there was nothing to indicate that plaintiffs regarded the contract as broken, or that they elected to terminate their relations with defendants. This claim that the defendants were wrongdoers, trespassers overriding the plaintiffs, and ruthlessly depriving them of their rights, damaging them to the extent of $200,000, was never asserted until immediately before this suit in equity was instituted in 1904, and at the date of this second trial, in 1906, the plaintiffs asked that they be allowed to increase their demand to $1,200,000. It is inconceivable that any state of facts existed justifying such a demand in view of the situation and the relation of the parties from 1899 down to 1904.

At the last trial the court directed the parties to specifically perform the agreement for the formation of the quarrying company. Although the learned trial judge expressed his views that plaintiffs had not made out a cause of action on their claims that defendants had broken the agreement of 1899, the interlocutory judgment did not adjudicate the question. The Appellate Division holds that "it is not within the province of equity jurisdiction to compel the specific performance of a contract to form a corporation under the circumstances disclosed in this case because the parties were unable to agree upon the terms for the formation of such corporation and are now hostile and unfriendly." The plaintiffs appealed from the last judgment. The defendants apparently accepted it and were willing to comply with the decree.

What, then, is the proper judgment in this case on the facts as found? I cannot find that defendants are at fault, that they refused to incorporate, or that they violated plaintiffs' rights. As to the Horton farm, the period within which plaintiffs could have paid their share of the purchase price and obtained an interest in the land has long since expired. The time within which the payment could be made was expressly made of the essence of the agreement, and it was provided that, if plaintiffs failed to pay the 40 per cent. of the cost of the land, the land was to be and remained the absolute property of defendants. I think plaintiffs have no interest in the Horton property. As to the Field farm, I think they are the owners of 40

per cent. of the property. If a corporation had been formed, the land would have been conveyed to the corporation and the plaintiffs would have received 40 per cent. of the stock. I think that the proper disposition of this case is to direct the sale of that land and a division of the price received between the parties—40 per cent. to plaintiffs, 60 per cent. to defendants. Neither litigant asks this relief. This is not the theory on which plaintiffs bring this action. They claim that they are the sole owners of the land; that defendants are trespassers. The defendants insist that as the suit is founded on the existence of these claims, which have been disallowed, they are entitled to an absolute judgment in their favor leaving plaintiffs to assert, in some other litigation, their claim for a share in the property. I think the best disposition to make of the matter is to provide in the judgment that either party may apply at the foot of the judgment for a direction for a sale of the land and a division of the proceeds, if so advised. This will leave the issue presented by the pleadings and the proofs here and decided by the court distinct and well defined—and for this reason I do not think the court should retain this suit for the purpose of settling the demands of the parties against each other for the rents of the buildings occupied by the laborers, or the amounts due for the grocery and supply bill deducted by defendants from the wages of the Italian employés on plaintiffs' account. The amounts involved are comparatively trivial when we take into consideration the real grievance asserted by the plaintiffs and for which this suit is brought. The amounts due upon these claims, as was shown on the trial, are readily determined. The rents received from buildings erected on the Field farm by either plaintiffs or defendants are to be divided 40 per cent. to the one, 60 per cent. to the other. This however, is not the claim advanced by plaintiffs. They demand all of the rents, on the theory that the agreement was rescinded, and that the land in its entirety belongs to them. The defendants must pay to plaintiffs any money collected from the laborers for plaintiffs' account, less 5 per cent., the amount which they were to receive for collecting. Where a court of equity obtains jurisdiction of a case for any purpose, it will proceed to decide the whole controversy, even though it involves issues legal in their nature; but when the demand upon which the suit is founded is determined adversely to plaintiffs, when the whole theory upon which plaintiffs come into equity is unfounded, then I think the court never acquired jurisdiction over the cause for any purpose, and should not retain jurisdiction to decide minor collateral matters about which there is substantially no dispute (Pomeroy, Equity Jurisprudence, §§ 231–242, and cases cited). I think such disposition of this case should be more satisfactory to plaintiffs as well as defendants, placing the judgment scarcely upon the issues tendered by the complaint. This is not an action to recover damages for breach of contract, but is brought in disregard and repudiation of, the contract. The theory of the complaint is that the defendants have shown such a total disregard of the agreement; that they have ignored it; that the plaintiffs are entitled to treat the conduct of defendants as an election on their part to assume the character of trespassers. The prayer for judgment is that defendants hold the real property, the legal title to which they now have, not for the purposes of the agreement. but as trustees for the plaintiffs—and judgment is demanded "requiring the defendants to reconvey said premises to the plaintiffs with a good and proper title upon such terms as to the court may seem just and proper."

I think the plaintiffs have not proved their case, and that the defendants should have judgment upon the merits with costs.

Argued before WOODWARD, JENKS, HOOKER, GAYNOR, and MILLER, JJ.

John C. Wait, for appellants.
Charles Haldane (David McClure, on the brief), for respondents.

GAYNOR, J. The learned counsel for the appellant has submitted to us a large volume of 361 pages which is called a brief. It is not a

brief, and does not serve the purpose of elucidating and aiding which is done by a brief. It has in addition an index of 12 pages, which is about the length the brief would have been if made after the way established for the making of briefs. The case is a simple one, was tried with care and true discernment by the learned trial judge, and as the opinion he filed leaves nothing additional to be said on the law or the facts, the judgment should be affirmed thereon.

Judgment affirmed, with costs. JENKS and MILLER, JJ., concur. WOOD-WARD and HOOKER, JJ., concur in result.